# MARY MOODY NORTHEN, INC.

v.

# ELLA BAILEY, ET AL.

Record No. 911581

June 5, 1992

Present: Carrico, C.J., Compton, Stephenson, Whiting, Lacy, and Keenan, JJ., and Poff, Senior Justice

*Catherine Currin Hammond (James L. Sanderlin; McGuire, Woods, Battle & Boothe*, on briefs), for appellant.
*John H. Kennett, Jr.* for appellees.

JUSTICE LACY delivered the opinion of the Court.

This is an adverse possession case involving 100 acres of mountainous land in Giles County. The 100 acres are part of a 2,475-acre parcel on which Mountain Lake Hotel is situated. Since the early 1900's, the Moody family, through various corporate entities, has owned the hotel and surrounding property. W.L. Moody, Jr., was actively involved with the operation of the hotel during his lifetime. His daughter, Mary Moody Northen, bought the property and hotel in 1968. Upon her death, the present legal title holder, Mary Moody Northen, Inc., a charitable foundation (the foundation or legal title holder), succeeded to her interest.

The claimants are the children of Jim Bailey. For most of his 71 years, Bailey lived in a four-room log house located in a clearing on the south slope of John's Creek Mountain. This site is within the 2,475-acre parcel now owned by the foundation. Although the house

itself was destroyed by fire soon after Bailey's death in 1971, his children periodically return to the land on which it was situated.

In 1989, six of the nine Bailey children (the children) filed this suit against Mary Moody Northen, Inc., seeking to establish that their father acquired an ownership interest in the land through adverse possession and that that interest passed to them upon his death. The trial court granted the children's motion for an issue out of chancery, and the jury returned a verdict awarding to the children 63 of the 100 acres claimed. However, the trial court found that Bailey had acquired title to only five of the 100 acres and so ruled in its final decree. We awarded the foundation an appeal.

The foundation contends that the judgment of the trial court must be reversed because, *inter alia*, the evidence did not support the trial court's decision that Bailey's possession was adverse to the ownership interests of the legal title holder.

■ The decision of the trial court was rendered after it received a jury verdict on issues submitted out of chancery pursuant to Code § 8.01-336(E). As such, the verdict is non-binding and advisory only. *Nelms* v. *Nelms*, 236 Va. 281, 290, 374 S.E.2d 4, 9 (1988). Nevertheless, the trial court's order, entered in light of that verdict, must be sustained on appeal unless it is plainly in error or without sufficient evidence to support it. In making this determination, we examine the evidence in the light most favorable to the prevailing party. *Carter* v. *Carter*, 223 Va. 505, 508-09, 291 S.E.2d 218, 220 (1982).

In this case, no one disputes that Bailey lived openly and continuously on the land in question during the relevant time period, 1935 to 1971.[1] Furthermore, the legal title holder was aware of Bailey's occupancy during this time. The foundation contends that Bailey's occupancy was with its permission and at its sufferance and, therefore, could not constitute adverse or hostile possession of the land which could ripen into ownership.

■ The elements of adverse possession are well established. In order to sustain their claim of ownership through their father, the children had the burden of proving that Bailey was in actual, hostile, exclusive and continuous possession of the disputed property under a claim of right for the statutory 15-year period. Additionally, the

---

[1] Although Bailey began living on the property when he was brought there at age 10 by his aunt and uncle, the parties stipulated that the only period during which adverse possession might have been established was from 1935 to 1971.

manner of possession must provide the true owner with actual or constructive knowledge of the adverse claim. *Leake* v. *Richardson*, 199 Va. 967, 976, 103 S.E.2d 227, 234 (1958). After reviewing the record, we conclude that the children failed to meet their burden of proof.

■ During the relevant time period, not only were the legal title holder and Bailey aware of each other's occupancy on the parcel, but they communicated on a number of occasions. Bailey sold produce to the hotel located on the same parcel of land and hauled away garbage. At one point, Bailey helped chop ice for the hotel and repaired the hotel's cottages. Bailey also acquiesced in the request of the foundation that he get firewood from fallen trees rather than by chopping down trees.

■ The legal title holder had a number of surveys made of the entire parcel; none was performed for the 100 acres in dispute here, and there are no monuments or markers delineating the boundaries of the 100 acres claimed.[2] Beginning in 1940, the hotel's caretaker marked the boundary of the entire parcel by marking the trees with white paint. This line was periodically repainted. Although the land occupied by Bailey was within those boundaries, he did not question the markings. In 1969, the land was surveyed again, and a line enclosing the Bailey house within the tract was marked. The supervisor of the survey party talked with Bailey as he measured the house's location for the plat; Bailey did not disrupt or otherwise question this survey.

■ Finally, the resident caretaker of the hotel from 1944 to 1984, the manager of the hotel from 1946 to 1961, and the manager's wife testified that Bailey lived on the land with Mr. Moody's permission.

In support of their claim, the children discount the testimony regarding the permissive nature of their father's occupancy. Rather, they assert that Bailey's occupancy of the house with his family "was sufficient to put any one on notice of the adverse or hostile claim." The children testified that their father told them that he owned the land pursuant to his uncle's deed and that he told the children the specific deed book number and page number in which the deed was recorded.[3] Other indicia of ownership relied on by the

---

[2] Fencing by Bailey himself was limited to enclosing areas for farm stock, and was not related to property boundaries.

[3] In earlier litigation, this deed was determined to be inferior to the foundation's deed.

children include evidence that Bailey gave neighbors permission to hunt on the land and that a neighbor, by deed, granted Bailey a right-of-way across his property to the land occupied by Bailey. The children also argue that the failure of the legal title holder to take any steps to remove or oust Bailey from occupancy of the land further supports their claim of ownership by their father's adverse possession.

Both parties point to an incident in the early 1950's as particularly probative of the relationship between the legal title holder and Bailey. In response to a newly enacted fence law, a fence was erected along the boundaries of the 2,475-acre parcel. Bailey tore down part of the fence because it interfered with his access to his home. As a result, the hotel manager told Bailey that he would have to let the fence stay up or he would be put off the land. The hotel manager testified that, in response, Bailey said:

> "You can't do that to me, you can't do that to me."

> I said, "I don't want to do that, but you just have to let the fence stay up." He walked down and came back, he had tears in his eyes, and he said, "I have a family."

When asked if Mr. Moody had insisted that the fence be replaced, the hotel manager answered that Mr. Moody had decided to give Bailey another chance and that the fencing was just overlooked. "[W]e left it so he could get in and out."

Even considering the evidence in the light most favorable to the prevailing party, as we must do, we cannot conclude, as do the children, that Bailey's response constituted notice to the legal title holder of his ownership claim. The statement "You can't do that to me," taken in context, cannot be characterized fairly as an affirmative statement of an adverse claim. Rather, it is more indicative of occupancy by permission.

 This is not simply a case of unchallenged occupancy which is open and notorious to all, including the legal title holder. Where, as here, the legal title holder is operating on the assumption that one living on its land is doing so with its permission, and does not interfere with that occupancy, it would be manifestly unjust to allow that occupancy to ripen into an ownership interest through the silence or inaction of the occupant. The presumptions are in favor of the legal title holder and, although they may be overcome, the claimant must

produce evidence which will overcome them. *Matthews* v. *W.T. Freeman Co.*, 191 Va. 385, 395, 60 S.E.2d 909, 914 (1950). The necessity of conveying hostile intent or claim of ownership is particularly important in a case of this sort.

 Here, the record reveals continuing occupancy; it supports a finding that the occupant told his children he owned the land; and it supports a finding that the occupant engaged in certain activities that were consistent with ownership. However, the record does not support even an inference that this claim of ownership was relayed to the true owner. With the single exception of the act of tearing down part of the fence, all of Bailey's expressions of ownership were to his children or neighbors. The legal title holder took affirmative steps to exercise its dominion and control over its property on more than one occasion; yet, Bailey objected only once. And, when confronted with the possible results of his action in tearing down the fence, Bailey indicated a desire to remain on the land, not out of right, but out of need for his family. That request was honored by the legal title holder.

For these reasons, we conclude that the trial court erred in holding that the claimant established ownership through adverse possession of land titled of record in the name of the foundation.[4] Accordingly, the decree of the trial court will be reversed, and we will enter final judgment for the foundation.

*Reversed and final judgment.*

---

[4] In light of this holding, it is unnecessary to consider the foundation's other assignments of error.