COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Beales, Fulton and Friedman
Argued at Norfolk, Virginia


DAVID TIDWELL, ET AL.

v.        Record No. 0629-24-1

KENNETH M. GOLDSMITH, ET AL.                              OPINION BY
                                                   JUDGE RANDOLPH A. BEALES
KENNETH M. GOLDSMITH, ET AL.                              JULY 1, 2025

v.        Record No. 0666-24-1

DAVID TIDWELL, ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG AND
COUNTY OF JAMES CITY
Holly B. Smith, Judge

S. M. Franck (Geddy, Harris, Franck & Hickman, L.L.P., on briefs),
for David Tidwell and Rachael Tidwell.

Ivan D. Fehrenbach (Dansby & Fehrenbach, on briefs), for Kenneth
M. Goldsmith and Ashley Overman-Goldsmith.


David Tidwell and Rachael D. Tidwell (collectively the "Tidwells") and Kenneth M.

Goldsmith and Ashley C. Overman-Goldsmith (collectively the "Goldsmiths") both appeal from

the judgment of the Circuit Court of the City of Williamsburg and James City County concerning

the ownership and use of certain easements.[1]  The Tidwells challenge the circuit court's ruling

that the Goldsmiths were not required to remove their trash hut from the easement, that the

Tidwells are not permitted to temporarily park within the easements, and that the Goldsmiths

_____

[1] These cases were consolidated by joint motion of the parties.  *See David Tidwell, et al.
v. Kenneth M. Goldsmith, et al.*, No. 0629-24-1 (Va. Ct. App. Aug. 28, 2024) (order); *Kenneth M.
Goldsmith, et al. v. David Tidwell, et al.*, No. 0666-24-1 (Va. Ct. App. Aug. 28, 2024) (order).

were not required to tear down the portion of their metal fence located on the northern border of the Tidwells' 15-foot easement. The Goldsmiths, on the other hand, challenge the circuit court's ruling that permission is an affirmative defense to a claim of adverse possession, that the Goldsmiths were barred by the statute of limitations in Code § 8.01-243(B) from obtaining damages, and that the Goldsmiths were barred by the statute of limitations in Code § 8.01-236 from recovering their land under the Tidwells' carport. The Goldsmiths also challenge the circuit court's ruling that the Goldsmiths are not permitted to park within the easements, that the Tidwells' 60-foot easement extends beyond the Tidwells' 15-foot easement, and that the Goldsmiths could not amend their pleadings to include the defense of permission against the Tidwells' adverse possession claim.

## I. BACKGROUND[2]

This case concerns a series of disagreements between two families—the Tidwells and the Goldsmiths—who currently own and occupy adjacent properties in James City County that were originally part of a single parcel of land owned by William Snyder and Bridie Snyder (collectively the "Snyders"), who are the parents of Rachael Tidwell. In 1965, the Snyders subdivided their approximately 21-acre parcel and conveyed 2.75 acres of that parcel to Blanche Roberts. Included on the 1965 plat (and to the east of the property deeded to Blanche Roberts by the Snyders) is a 60-foot right-of-way giving the Snyders access to a public road (Route 681, which is also Sandy Bay Road). In 1975, the Snyders deeded a 0.642-acre lot to their daughter, Rachael Tidwell (whose name was Rachael D. Spalding at the time this property was deeded to her). As part of this 1975 deed, the Snyders also conveyed to their daughter an easement across

---

[2] "Because this matter comes to us after a trial of the issues below, we owe deference to the trial court's factual findings and must view the evidence in the light most favorable to the prevailing party below." *Town of S. Hill v. Hawkins*, 82 Va. App. 801, 807 n.3 (2024) (quoting *Suffolk City Sch. Bd. v. Wahlstrom*, 302 Va. 188, 196 n.1 (2023)).

the 60-foot right-of-way shown in the 1965 plat and an additional easement across a 15-foot area between Rachael Tidwell's lot and Blanche Roberts's lot. The 1975 deed specifically provided:

> All that certain lot, piece or parcel of land lying and being situate in James City County, Virginia consisting of .642 acres, more or less, by survey shown and described as Proposed Lot #1 on that certain plat entitled, "A PLAT SHOWING PROPERTY TO BE CONVEYED BY W. C. & BRIDIE SNYDER, BERKELEY DISTRICT, JAMES CITY COUNTY, VA.", dated January 22, 1975, made by Deward M. Martin and Associates, Inc., Toano, Virginia, which said plat is attached hereto and incorporated herein by reference thereto for a more particular description of the property herein conveyed.

> Together with a right of way for ingress and egress from State Route #681 over, along and across a certain sixty (60) foot right of way shown on the abovementioned plat, and a certain plat of record in Deed Book 103, page 493, entitled, "Plat Showing Property of Blanche C. Roberts, James City County, Williamsburg, Va.", dated November 1, 1965 and made by R. P. Moore, C.L.S., which was recorded simultaneously with a Deed from the Grantors herein to Blanche C. Roberts, dated November 11, 1965 and recorded November 17, 1965; ALSO INCLUDED in this conveyance is a right of way for ingress and egress to the said sixty (60) foot right of way abovementioned over, along and across a fifteen (15) foot right of way intersecting with the said sixty (60) foot right of way as shown on the attached plat.

Rachael later married David Tidwell. Rachael Tidwell and her husband have lived on the property conveyed to them by Rachael's father and mother for "[a]pproximately 31 years." The Tidwells constructed a carport on their lot in the "late '90s, maybe early 2000, 2001, at the latest." In 2012, William Snyder's executor conveyed the Snyder lot to John Reese and Debra Reese—which was less than 15 years ago. Rachael Tidwell testified that she "didn't have difficulty when the Reeses were there." When the Reeses discovered that the Tidwells had built the carport partially on what was now the Reese parcel, John Reese "said not to worry about the

- 3 -

carport going over because he had 16 other acres."[3]  After "seven or eight years" of ownership, the Reeses sold what had previously been the Snyder lot to the Goldsmiths in 2019.

The Tidwells and the Goldsmiths testified that they did not have any problems with each other at the beginning of their being neighbors.  The subsequent disagreements between them, however, arose out of an earlier disagreement between the Goldsmiths and the Ozmers, other neighbors to both the Goldsmiths and the Tidwells, who own a parcel fronting the public road.  Ashley Goldsmith testified that Brandon Ozmer allowed his German Shepherd to run from the Ozmer parcel onto the Goldsmiths' yard.  Mrs. Goldsmith explained that her son "was starting to learn how to walk, and I didn't feel comfortable with him and the dog, you know.  So I talked to my husband, and he said maybe we should put a fence up."  In 2021, the Goldsmiths hired a contractor to build a barbed wire fence as a barrier between themselves and the Ozmer parcel.

The Goldsmiths testified that when their property was surveyed so that they could install the barbed-wire fence, they were "surprise[d]" to learn that "the carport was over the property line."  A snapshot of the relevant portion of a 2019 survey, when the Goldsmiths purchased the property, depicts the two easements at issue:

---

[3] Rachael Tidwell initially testified that she and her husband learned that the carport encroached on the Goldsmiths' property "[w]hen the Goldsmiths told us."  However, when asked if she recalled "saying under oath on June 16th that you learned about the property line when Mr. Rees[e] bought the property," Mrs. Tidwell replied, "Actually, it was, yes."



The Goldsmiths also "noticed that the area where the Tidwells had been shooting" their firearms and where the Tidwells' burn barrel was located "was actually our property." The Goldsmiths then asked the Tidwells to remove their items from the Goldsmiths' property. Although the Tidwells did remove some of their items, including "a trailer parked on our [the Goldsmiths'] property for quite some time," they were reportedly slower to respond to further requests from the Goldsmiths. At the same time, however, David Tidwell testified that the Goldsmiths constructed a "trash hut" within the 60-foot easement.

On November 9, 2021, the Goldsmiths filed suit against the Tidwells for trespass, and they also sought a declaratory judgment regarding the scope of "the rights conferred on the Defendants by the Easements." The Goldsmiths' complaint stated that "a 'carport' structure owned by the Defendants and installed on their property" had "physically encroached

approximately eight feet onto the Plaintiffs' Property." The complaint further stated that "Defendants have trespassed on the Property and used the Roads in a manner that exceeds the rights granted" to them (1) by "dumping burned material, household trash and materials" on the easement; (2) by "parking vehicles and trailers" on the easement; and (3) by storing "farm equipment and automotive parts" on the easement. On December 9, 2021, the Tidwells filed their answer and counterclaim, asserting a claim of adverse possession of the part of the Goldsmiths' property located under the carport and alleging that the Goldsmiths had obstructed the easement "by installing fences and posts" and by "piling wood debris."

Sometime before January 2023, the Goldsmiths erected an eight-foot-tall metal fence in place of their existing barbed wire fence. In their amended counterclaim, the Tidwells claimed that this new metal fence constituted a nuisance. On August 23, 2023, following several continuances, the Goldsmiths sought leave of court to amend their pleadings to include the defense of permission against the Tidwells' adverse possession claim. The Goldsmiths made this motion in response to an August 15, 2023 partial summary judgment motion filed by the Tidwells in which the Tidwells asserted that the Goldsmiths' defense of permission was "an affirmative defense which must b[e] pled."

The parties then appeared before the circuit court on August 29, 2023, to argue the motion. Addressing the scope of the easements at issue in this case, the circuit court found that the 15-foot easement is "adjacent to the northern border of the Tidwells' Property" and "extend[s] from the northern border of the Tidwells' Property to the southern border of the parcel referred to as the Ozmer Parcel." The circuit court also found that "the sixty (60) foot right of way created in the deed recorded in James City County Deed Book 163 Page 384 extends from State Route #681 to the southeastern corner of the Tidwell Property." In so finding, the circuit court noted that the 60-foot easement extends south of the intersecting 15-foot easement because

"the deed uses language that it is across the 15-foot right-of-way, and it is intersecting with, not coming to a dead stop at" the 15-foot easement.

Turning to the Goldsmiths' trespass claim, the circuit court stated that "Code § 8.01-243(B) establishes a five year statute of limitations for claims of monetary damages due to trespass" and that "[t]his action was commenced more than five years after December of 2012," when the trespass was alleged to have begun. The circuit court thus concluded that "the statute of limitations on that ground has run."

Regarding the Tidwells' adverse possession claim, the circuit court found that "permission is an affirmative defense to a claim of adverse possession." Noting that the "Goldsmiths concede that they have not pled permission in their Answer to the Tidwells' counterclaim," the circuit court stated that "at this point, it is a defense that should have been pled." Given that "this matter has been on the docket since 2021," the court ruled that as of August 2023, "the time for amendment of pleadings has passed."

At the trial on October 26, 2023, the circuit court took evidence and heard testimony from the parties. The Goldsmiths testified about the location of the metal fence they had erected on the northern portion of the 15-foot easement. When asked whether the Goldsmiths had "put up a fence along the 15-foot easement from your gate to the corner of the Tidwell/Ozmer" properties, Ashley Goldsmith stated, "Yeah, we just wanted to walk the road and not have to worry about the dogs jumping on us." She also noted that "the barbed-wire fence was first installed on the 15-foot easement." When asked whether the "metal fence is on your property," Ashley Goldsmith responded, "Yes."

Kenneth Goldsmith testified that "the metal [fence] went on the line and not six millimeters over the line." In addition, when asked whether the "metal fence that is north of the Tidwells is on your property" and whether the fence is "on the 15-foot easement," Kenneth

- 7 -

Goldsmith replied, "Yeah, that would be the same answer that my wife had this morning." Furthermore, when asked whether he remembered "testifying earlier during this matter that it [the metal fence] was on your property and you were careful to have it installed on your property," Mr. Goldsmith stated, "Yeah."

The Goldsmiths and the Tidwells also testified about the parties temporarily parking on the easements. Ashley Goldsmith testified that "David [Tidwell] parked his truck in the middle of the road one day and got out" and then "tried to fight Ken [Goldsmith]." She also testified that when she "would try to leave to take my son to school or come home from something or put my garbage can out or bring it in, David Tidwell would go sit in the driveway in his truck." Mrs. Goldsmith maintained that the Tidwells' obstruction of the easement increased after charges were filed against her for stalking her neighbors.[4] She claimed that she "was fearful that they would find some way to have me locked back up for just driving out of my driveway." In addition, Mrs. Goldsmith explained that before she was charged, the Tidwells "would actually go to their property and hang out on their property" instead of standing "in the middle of the road or on the easement," but that after she was charged, they would "congregate, you know, drink out there."

David Tidwell similarly testified that the Goldsmiths "would pull up through the easement there, and they would stop to unload the garbage into the little hut." He noted that the Goldsmiths "would take their time, take a little bag here and go around this door or around that door and just take as much time as they wanted." Mr. Tidwell explained that the Goldsmiths would take "about 10 minutes to unload a two-minute job"—and he pointed out that he "couldn't

---

[4] Ashley Goldsmith was not the only person against whom criminal charges were filed in this matter. When asked by her attorney whether it was "fair to say almost everybody involved had a protective order or a criminal charge of some fashion, except for your husband," Mrs. Goldsmith said, "Yes."

get in or out because that was a 14-foot driveway, and there's a truck sitting there. You can't get past it." He also stated that the Goldsmiths installed cameras near the easement that would "go off and tak[e] a picture of" him whenever he would "go out and get in [his] truck."

By final order entered on March 21, 2024, the circuit court ruled that "the Tidwells are perpetually enjoined and restrained from dumping or disposing anything on the Goldsmiths' property, from storing anything on the Goldsmiths' property, and from burning trash or other items on the Goldsmiths' property." Noting that the Tidwells' easement "is for ingress and egress only to State Route #681," the circuit court ruled that "the parties are perpetually enjoined and restrained from parking in said easement, dumping any material, storing any equipment or blocking said easement." Regarding the "trash hut," the circuit court found that it "is not currently obstructing the easement and does not need to be removed and there is no obstruction of the Easement in that area." In addition, regarding the carport, the circuit court found that because "it has been in the same place for more than twenty years," "the Tidwells have acquired title to the land under the portion of the Carport that encroaches on Goldsmith property" by adverse possession and that the Goldsmiths were separately "barred by the fifteen-year statute of limitations" in Code § 8.01-236 from "any action to recover the Carport Parcel." Regarding the Goldsmiths' fence, the circuit court stated, "I don't think the Goldsmiths have to take down the property—or take down the fence. It is on their property." The circuit court further stated, "The fences, whether it be the split rail or whether it be the metal fence, ha[ve] not prevented the purposes of the easement." Finally, the circuit court concluded that "the Goldsmiths' boundary fences may remain" because "the Goldsmiths have a right as a matter of law to erect a boundary fence," and the metal fence "is not a nuisance."

The Tidwells and the Goldsmiths now appeal to this Court.

## II. ANALYSIS

### A. Adverse Possession

On appeal, the Goldsmiths argue, "The trial court erred by finding that in this particular case, permissive use should have been pleaded as an affirmative defense to adverse possession." The Goldsmiths also argue, "The trial court erred by refusing to grant the Goldsmiths leave to amend the Amended Complaint to include an argument of permissive use to defend against the claim of adverse possession."

"Whether a factual issue constitutes a prima facie element of a claim, or is an affirmative defense, is a question of law reviewed de novo." *Smith v. McLaughlin*, 289 Va. 241, 260 (2015). *See also SunTrust Bank v. PS Bus. Parks, L.P.*, 292 Va. 644, 652 (2016) (reviewing *de novo* whether a defense constituted an affirmative defense).

The Supreme Court has stated, "An 'affirmative defense' is a 'defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true.'" *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 252 (2023) (alterations in original) (quoting *Black's Law Dictionary* 528 (11th ed. 2019)). "Where a defendant seeks to rely upon an affirmative defense not apparent from the allegations pled and unrelated to the elements of a plaintiff's cause of action, that affirmative defense must be pled to avoid unfair surprise or prejudice to the plaintiff." *Eilber v. Floor Care Specialists, Inc.*, 294 Va. 438, 443 (2017) (quoting *New Dimensions, Inc. v. Tarquini*, 286 Va. 28, 36 (2013)). "Traditional affirmative defenses or special pleas that constitute an absolute bar to recovery include 'statute of limitations, absence of proper parties, res judicata, usury, a release, prior award, infancy, bankruptcy, denial of partnership, bona fide purchaser, and denial of an essential jurisdictional fact alleged in the bill.'" *New Dimensions, Inc.*, 286 Va. at 36 (quoting *Monahan v. Obici Med.*

*Mgmt. Servs.*, 271 Va. 621, 634 (2006)). "The requirement that most such defenses be specifically pled arises from their collateral nature." *Id.*

In Virginia, a party claiming adverse possession "must prove actual, hostile, exclusive, visible, and continuous possession, under a claim of right, for the statutory period of 15 years." *Grappo v. Blanks*, 241 Va. 58, 61 (1991). "A claimant has the burden of proving all the elements of adverse possession by clear and convincing evidence." *Id.* at 62. "The doctrine of adverse possession in Virginia has a long history," and "[m]any cases are fact-specific" such that "their resolution may turn on only one or two of the elements of adverse possession." *Quatannens v. Tyrrell*, 268 Va. 360, 365 (2004). Addressing the element of hostile possession, the Supreme Court has explained that a party "is in *hostile* possession if his possession is under a claim of right and adverse to the right of the true owner." *Grappo*, 241 Va. at 62 (emphasis in original). However, as the Court has stated, when "the original entry on another's land was by agreement or permission, possession regardless of its duration presumptively continues as it began, in the absence of an explicit disclaimer." *Kim v. Douval Corp.*, 259 Va. 752, 757 (2000) (quoting *Matthews v. W.T. Freeman Co.*, 191 Va. 385, 395 (1950)).

When a party claims adverse possession over land owned by that party's parent, the Supreme Court has also made clear that "we must assume that she entered upon the property by permission." *Edmunds & Abernathy v. Pike*, 136 Va. 270, 274 (1923). "Presumptively, such use by a child of his parent's land is permissive" unless there is evidence "to rebut the presumption." *McIntosh v. Chincoteague Volunteer Fire Co.*, 220 Va. 553, 557 (1979). *See also Mary Moody Northen, Inc., v. Bailey*, 244 Va. 118, 122 (1992) (stating that when "the legal title holder is operating on the assumption that one living on its land is doing so with its permission, and does not interfere with that occupancy, it would be manifestly unjust to allow that occupancy to ripen into an ownership interest through the silence or inaction of the occupant").

- 11 -

While Virginia courts have not directly addressed whether permission is an affirmative defense to a claim of adverse possession, the Virginia cases touching on this issue tend to indicate that permission is *not* an affirmative defense to an adverse possession claim. The Supreme Court has stated, "Permission is properly viewed as a defense to a claim of adverse possession"—but the Supreme Court has not characterized permission as an *affirmative* defense. *See, e.g.*, *Quatannens*, 268 Va. at 373. The fact that "permission negates hostile possession" (a required element for an adverse possession claim) indicates that permission is *not* an affirmative defense because permission is a regular defense that simply negates adverse possession—and thus is not collateral to a party's adverse possession claim. *See id.* at 372. Consequently, a party arguing the defense of permission need not specifically plead that defense because it cannot be said that the absence of such a pleading would cause "unfair surprise or prejudice to the" other party.[5] *New Dimensions, Inc.*, 286 Va. at 36.

Because the Tidwells were the first party in this matter to claim adverse possession, the Tidwells therefore bore the burden of proving each element of adverse possession, including that such possession was hostile (and thus without permission). *See Grappo*, 241 Va. at 61-62. Therefore, the Goldsmiths were not barred from later arguing permission as a defense once the Tidwells made an adverse possession claim in this case. The record before this Court on appeal shows that the Tidwells built the carport while Rachael Tidwell's father owned what is now the Goldsmiths' land. The record also shows that while the Reeses next owned the Goldsmiths' land,

---

[5] While not binding on this Court, multiple appellate courts of our sister states have ruled that permission is *not* an affirmative defense to a claim of adverse possession. *See, e.g.*, *Thoma v. Watson*, 325 A.3d 955, 965 (Conn. App. Ct. 2024) (holding that "permissive use is not a defense that must be specially pleaded"); *Eckman v. Ramunno*, 2010 Ohio App. LEXIS 3642, at *18 (2010) (recognizing that permission is a "regular defense that is sufficiently raised by the denial of the plaintiff's claim that the use was adverse"); *Welsch v. Smith*, 113 P.3d 1284, 1289 (Colo. App. 2005) (stating that "permission was not an affirmative defense"); *Mikel v. Dev. Co.*, 602 S.W.2d 630, 635 (Ark. 1980) ("Permissive use is not an affirmative defense which must be pleaded . . . .").

the Tidwells learned that the carport encroached on that land, but, as Mrs. Tidwell testified, John Reese "said not to worry about the carport going over because he had 16 other acres." It is well-established that when "the original entry on another's land was by agreement or permission, possession" will "presumptively continue[] as it began." *Kim*, 259 Va. at 757 (quoting *Matthews*, 191 Va. at 395). Furthermore, this presumption of permission clearly applies in the parent-child context (here between Rachael Tidwell and her parents, the Snyders) because as "a general rule an adverse possession cannot be predicated" on "the possession of a child as against its parent." *Pike*, 136 Va. at 274.

Given that the Tidwells bore the burden of rebutting the presumption of permission, it would "be manifestly unjust" to require the Goldsmiths to plead permission as an affirmative defense because it would allow the Tidwells' "occupancy to ripen into an ownership interest through the silence or inaction of the occupant," when the Goldsmiths were "operating on the assumption that one living on its land is doing so with its permission." *Mary Moody Northen, Inc.*, 244 Va. at 122. Therefore, we hold that the circuit court erred in ruling that permission had to be pled by the Goldsmiths here, given that it was the Tidwells' burden to prove all the elements of adverse possession—including that the adverse possession they alleged was hostile. Consequently, we remand this matter to the circuit court for a full hearing on the merits of the adverse possession claim.[6]

---

[6] Because we conclude that the Goldsmiths did not have to plead permission as a defense to the adverse possession claim in this case, we cannot reach the issue of whether the statute of limitations in Code § 8.01-236 bars the Goldsmiths from any action to recover the land underneath the Tidwells' carport—or whether the statute of limitations in Code § 8.01-243(B) bars the Goldsmiths' claim for damages arising out of the Tidwells' alleged trespass. Answering these questions depends, in part, on what additional evidence, if any, is considered and weighed by the circuit court on remand. *See Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) (explaining that the "'doctrine of judicial restraint dictates that we decide cases "on the best and narrowest grounds available"'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).

## B. The Parties' Use of the Easements

On appeal, the Tidwells argue, "The trial court reversibly erred in failing to require the Goldsmiths to remove the trash hut, plantings, debris, posts and other permanent improvements placed or installed by them within the Easement Area because, as a matter of law, the entire width of the Easement Area must remain unobstructed and cannot be encroached upon." They also argue, "The trial court reversibly erred in failing to consider whether occasional, limited duration parking within the Easement Area which does not impede use of the Easement Area for ingress or egress is a reasonable use of the Easement Area which does not additionally burden the servient estate." In addition, the Tidwells argue, "The trial court reversibly erred in treating the fence entirely within the Easement Area adjacent to the northern boundary of the Fifteen Foot Area as a boundary or division fence and in failing to require its removal because a boundary fence must be partially located on each of the properties whose boundaries it delineates." At the same time, however, the Goldsmiths contend, "The trial [court] erred by finding that the Goldsmiths were prohibited from parking in the easement if such parking did not unreasonably interfere with the Tidwells' ingress and egress."

### 1. *The "Trash Hut" and Temporary Parking on the Easement*

"We review de novo a circuit court's interpretation of covenants, deeds, options, and other related documents." *Beeren & Barry Investments, LLC v. AHC, Inc.*, 277 Va. 32, 37 (2009). "An easement is a privilege held by one landowner to use and enjoy certain property of another in a particular manner and for a particular purpose." *Anderson v. Delore*, 278 Va. 251, 256 (2009). "In resolving a dispute between landowners regarding the terms of an easement that is granted or reserved expressly by deed, we apply the customary rules governing the construction of written documents." *Id.* at 257. "If the language in a deed creating an easement

is unambiguous, courts should interpret the deed solely based on the deed's language." *Marble Technologies v. Mallon*, 290 Va. 27, 33 (2015).

The Supreme Court has explained that a party cannot "appropriate a portion of the easement and reduce" the width of an easement because the party granted an easement right is "entitled to the free and continuous use and enjoyment" of that easement for its intended purpose, including "for the purpose of ingress and egress." *Pizzarelle v. Dempsey*, 259 Va. 521, 531 (2000) (holding that a party could not "reduce a 24-foot easement to one of 19 to 20 feet in width" because the "terms of the easement specifically guaranteed that right to them and further stated that no owner of a lot shall perform any act that interferes with that right"). Indeed, when "the easement is for a right of way, even if the easement area contains an existing driveway/roadway whose width does not encompass the entire width of the easement, the entire width specified in the easement must remain unobstructed." *Forbes v. Cantwell*, 78 Va. App. 454, 473 (2023). *See also Snead v. C&S Props. Holding Co.*, 279 Va. 607, 609 (2010). Simply put, binding precedent from both the Supreme Court and from this Court "prohibit[s] obstructions within the easement area." *Forbes*, 78 Va. App. at 473.

Both the Tidwells and the Goldsmiths have placed obstructions within the easement area—with the Goldsmiths placing a trash hut and other items in the easement and both the Tidwells and the Goldsmiths parking vehicles in the easement. According to the plain words of the deed granting Rachael Tidwell the easements at issue, she was granted "a right of way for *ingress and egress* from State Route #681 over, along and across a certain sixty (60) foot right of way" that included "a right of way for *ingress and egress* to the said sixty (60) foot right of way abovementioned over, along and across a fifteen (15) foot right of way intersecting with the said sixty (60) foot right of way." (Emphases added). Given that Rachael Tidwell was granted an easement over what is now the Goldsmiths' land and given that this easement was for ingress

- 15 -

and egress, neither the Goldsmiths nor the Tidwells can use the easement for something other than ingress and egress. As noted *supra*, when a granted easement creates a right of way, "the entire width specified in the easement must remain unobstructed"—even when "the easement area contains an existing driveway/roadway whose width does not encompass the entire width of the easement." *Forbes*, 78 Va. App. at 473.

This rule applies equally to both the servient estate (here the Goldsmiths) and to the dominant estate (here the Tidwells). As the dominant estate, the Tidwells cannot use the easement in a way that "is different from that established at the time of its creation," *Hayes v. Aquia Marina, Inc.*, 243 Va. 255, 258 (1992), because instruments "creat[ing] an easement must be strictly construed, with any doubt being resolved against the establishment of the easement," *Forbes*, 78 Va. App. at 466 (alteration in original) (quoting *Burdette v. Brush Mt. Estates, LLC*, 278 Va. 286, 297 (2009)). However, the record before this Court on appeal shows that the Tidwells repeatedly parked on the easement and that this action frustrated the Goldsmiths' ability also to use the easement for its intended purpose of ingress and egress. Ashley Goldsmith testified that "David [Tidwell] parked his truck in the middle of the road one day and got out" and that he even "tried to fight Ken [Goldsmith]." She also testified that when she "would try to leave to take my son to school or come home from something or put my garbage can out or bring it in, David Tidwell would go sit in the driveway in his truck." Mrs. Goldsmith further explained that she "was fearful that they [the Tidwells] would find some way to have me locked back up for just driving out of my driveway." In short, because the granted easements in this case are for the express purpose of ingress and egress and because parking within the easement area differs from that express purpose, the Tidwells simply cannot park within the easements.

The Goldsmiths also cannot park within the easements. Furthermore, they likewise cannot place their trash hut or other debris within the easements because "the owner of the

- 16 -

servient estate" cannot "unreasonably interfere with the use granted in the easement." *Walton v. Capital Land*, 252 Va. 324, 326 (1996). The record establishes that the Goldsmiths' parking within the easement "unreasonably interfere[d]" with the Tidwells' use of the easement for ingress and egress. David Tidwell testified that the Goldsmiths "would pull up through the easement" to "unload the garbage into the little hut" and that the Goldsmiths would "take their time, take a little bag here and go around this door or around that door." He also stated that the Goldsmiths would go so far as to take "about 10 minutes to unload a two-minute job"—and he explained that he simply could not "get in or out because that was a 14-foot driveway, and there's a truck sitting there. You can't get past it."

While the owner of the servient estate "retains the right to use his land in any manner which does not unreasonably interfere" with the dominant estate's use, *Walton*, 252 Va. at 326, the record before this Court on appeal shows that allowing the Goldsmiths to park within the Tidwells' easement would unreasonably interfere with the Tidwells' ingress and egress rights under that easement. The same is true of the Goldsmiths' decision to place their trash hut, their posts, and their other debris within the easement, all of which frustrate the express purpose of the easement—and actually take or appropriate part of the easement for something other than ingress and egress. We therefore affirm the circuit court's ruling that neither party can use the easements for parking. However, we reverse and vacate the circuit court's ruling that the Goldsmiths did not need to remove the trash hut that they had placed in the easement, and we remand for the circuit court to enter an order so directing the Goldsmiths to remove the trash hut.

2. *The Goldsmiths' Metal Fence on the Northern Border of the 15-Foot Easement*

It is well-settled that "like other contracts, we review a trial court's construction of a deed of easement de novo." *Wetlands Am. Trust, Inc. v. White Cloud Nine Ventures, L.P.*, 291 Va. 153, 160 (2016). However, as "to purely factual determinations made by the trial court, we will not

disturb those findings unless they are plainly wrong or without evidence to support them." *Id.* (quoting *Perel v. Brannan*, 267 Va. 691, 698 (2004)). *See also Suffolk City Sch. Bd. v. Wahlstrom*, 302 Va. 188, 196 n.1 (2023) ("Because this matter comes to us after a trial of the issues below, we owe deference to the trial court's factual findings and must view the evidence in the light most favorable to the prevailing party below.").

The Supreme Court has held that "a servient landowner may not effectively narrow the defined width of an easement by placing obstructions *amounting to* 'a *material* encroachment on the dominant owner['s] rights.'" *Piney Meeting House Investments, Inc. v. Hart*, 284 Va. 187, 194 (2012) (alteration and second emphasis in original) (quoting *Pizzarelle*, 259 Va. at 530). *See also Willing v. Booker*, 160 Va. 461, 465 (1933) (stating that "where a reservation is of a certain width, that width cannot be encroached upon"). However, "the owner of a servient estate may still make reasonable use of land burdened by an easement of defined width." *Piney Meeting House*, 284 Va. at 194. Indeed, the Supreme Court has recognized that

> the owner of a servient tenement has as much right to fence against his land subject to an easement as he has to fence against an estate in fee; and if he can fence against land subject to an easement it must be by a line fence, which of necessity must to some extent, at least, encroach upon both estates.

*Willing*, 160 Va. at 467 (explaining that such fence "must not make the easement 'less useful or less convenient'"). Thus, when considering an encroachment on an easement of a defined width, the "test is reasonableness." *Id.* at 466.

In *Willing v. Booker*, the owner of the dominant estate removed an "unsightly board fence" that she claimed "was on or just to the south of said twelve-foot roadway." *Id.* at 465. The owner of the servient estate then replaced the board fence with a wire fence that the owner of the dominant estate claimed was a "spite fence and located well within the alley." *Id.* The Supreme Court found that "the new fence stands as near as may be where the old one was and

takes up less room.  Even if it were slightly out of line it would make no difference." *Id.*  The

Supreme Court then ruled in favor of the owner of the servient estate because the owner of the

dominant estate's "objections are quite too technical for the administration of a neighborhood

law like this, which was designed for the purpose of reasonable and practical justice." *Id.*

(quoting *Scott v. Jackson*, 93 Ill. App. 529, 535 (1901)).

In *Pizzarelle v. Dempsey*, the owners of the servient estate placed a fence "approximately

four to five feet inside the southern border" of an easement that was to "be used exclusively for

the purpose of ingress and egress." 259 Va. at 524, 526.  The Supreme Court concluded that the

owners of the servient estate had to remove the fence because it was "a material encroachment

on the dominant owners' rights." *Id.* at 527, 530.  Similarly, in *Snead v. C&S Properties Holding

Co.*, the servient owner erected a chain-link fence, put in signs, and placed riprap within a 60-

foot-wide easement that narrowed the effective width of the easement.  279 Va. at 610-11.  The

fence in that case prevented the owner of the dominant estate "from utilizing approximately two-

thirds [of] the width of the Easement" and thus amounted to "'a material encroachment on the

dominant owners' rights' because 'a significant portion of the [E]asement would be rendered

unusable for ingress and egress if injunctive relief were denied.'" *Id.* at 616 (second alteration in

original) (quoting *Pizzarelle*, 259 Va. at 530-31).  Applying these principles, the Supreme Court

in *Piney Meeting House* found that the owner of the servient estate did not materially encroach

on the owner of the dominant estate's use of its easement for ingress and egress when the owner

of the servient estate buried a propane tank and a well underneath the easement.  284 Va. at 190,

194-96.

Turning to the facts at issue in this case, we hold that the Goldsmiths do not need to

remove the portion of their metal fence that is on the northern border of the 15-foot easement.

When asked if she "put up a fence along the 15-foot easement from your gate to the corner of the

Tidwell/Ozmer" property, Ashley Goldsmith responded, "Yeah, we just wanted to walk the road and not have to worry about the dogs jumping on us." When asked whether the metal fence was "on the 15-foot easement," Kenneth Goldsmith similarly stated, "Yeah, that would be the same answer that my wife had this morning." He maintained that "the metal went on the line and not six millimeters over the line." The Tidwells did not provide any evidence showing that the Goldsmiths' metal fence obstructed or otherwise interfered with their use of the easement for ingress and egress.[7]

Furthermore, the Goldsmiths' metal fence simply does not amount to "a material encroachment on the dominant owner['s] rights" because the fence is located entirely on the Goldsmiths' land (or right on the Goldsmiths' property line with the Ozmers)—and because there is no evidence that the fence has in any way prevented the Tidwells from using the easement for ingress and egress. *Pizzarelle*, 259 Va. at 530. Unlike the fence at issue in *Pizzarelle*, the fence at issue here is right on the property line. *Id.* at 524. The fence also does not reduce the width of the easement by two-thirds, as was the case with the fence at issue in *Snead*. The record shows that the Goldsmiths' fence takes up a very small amount of space in width and that it is located on the property line between the Goldsmiths and the Ozmers—along the portion of the easement that is the farthest from the Tidwells—with Kenneth Goldsmith actually testifying that the fence was "on the line and not six millimeters over the line." Rather than making "a significant portion of the easement" entirely "unusable for ingress and egress," *Pizzarelle*, 259 Va. at 531, the Goldsmiths' metal fence takes up as little space of the easement area as is practically possible because it is located on the property line. Indeed, the Goldsmiths exercised their "right to fence

---

[7] Addressing the metal fence, the circuit court stated, "I don't think the Goldsmiths have to take down the property -- or take down the fence. It is on their property." The circuit court's finding that the metal fence is entirely within the easement area that is part of the Goldsmiths' property is a factual finding to which this Court owes deference on appeal. *Wetlands Am. Trust, Inc.*, 291 Va. at 160.

against" their own "land subject to an easement," and they did so in a manner that in no way interfered with the Tidwells' right to use the easement for ingress and egress. *Willing*, 160 Va. at 467. *See also Piney Meeting House*, 284 Va. at 194 (recognizing that "the owner of a servient estate may still make reasonable use of land burdened by an easement of defined width").

In short, the easement at issue in this case has not been made "less useful or less convenient," and under the Supreme Court's longstanding test of reasonableness, we hold that the circuit court did not err in deciding that the Goldsmiths' metal fence can remain in place. *Willing*, 160 Va. at 466.

### C. The Dimensions of the Tidwells' Easement

Finally, the Goldsmiths argue, "The trial court erred by determining the dimensions of the Tidwells' 60'easement in this matter: In particular, the trial court erred by finding that the Tidwells' 60' easement extends south of the intersecting 15' easement."

As noted *supra*, "we review a trial court's construction of a deed of easement de novo." *Wetlands Am. Trust, Inc.*, 291 Va. at 160. Where "the granting language" for an easement "states the object or purpose of the easement, the dimensions of the easement may be inferred 'to be such as are reasonably sufficient for the accomplishment of that object.'" *Anderson*, 278 Va. at 257 (quoting *Hamlin v. Pandapas*, 197 Va. 659, 664 (1956)). "[W]here a deed incorporates a plat by reference, 'that plat must be considered "part of the instrument itself."'" *Auerbach v. County of Hanover*, 252 Va. 410, 414 (1996) (quoting *Faison v. Union Camp Corp.*, 224 Va. 54, 59 (1982)). Incorporation occurs when "a lot is thus described as on a map or plat, to which reference is made." *Burdette*, 278 Va. at 298 (quoting *Mahoney v. Friedberg*, 117 Va. 520, 528-29 (1915)); *see Auerbach*, 252 Va. at 413 (finding that a deed incorporated a plat when it referenced the plat as "the hereinabove described plat"). An incorporated plat is only considered "for descriptive purposes to establish the metes and bounds of the property being conveyed."

*Burdette*, 278 Va. at 298. However, when "there would be an ambiguity in the deed" without "reference to the incorporated plat," then "the clear and unambiguous language on the incorporated plat and its depiction of the perimeter metes and bounds of" parcels can help to resolve "ambiguity and establishes the grantors' intent." *Auerbach*, 252 Va. at 414.

In this case, the plain language of the deed granting the Tidwells their easements provides for "a right of way for ingress and egress from State Route #681 over, along and *across* a certain sixty (60) foot right of way shown on the abovementioned plat." (Emphasis added). The deed also states that the referenced plat is "attached hereto and incorporated herein by reference thereto for a more particular description of the property herein conveyed." The deed further mentions that the 60-foot right of way "shown on the abovementioned plat" is also shown on "a certain plat of record in Deed Book 103, page 493, entitled, 'Plat Showing Property of Blanche C. Roberts, James City County, Williamsburg, Va.', dated November 1, 1965 and made by R. P. Moore, C.L.S."

The deed does not expressly limit the Tidwells to accessing State Route 681 only from the northern portion of their property. Instead, the deed gives the Tidwells two ways to access their property from the public road: (1) "a right of way for ingress and egress from State Route #681 over, along and *across* a certain sixty (60) foot right of way"; and (2) "a right of way for ingress and egress to the said sixty (60) foot right of way abovementioned over, along and *across* a fifteen (15) foot right of way *intersecting* with the said sixty (60) foot right of way." (Emphases added). The deed also notes that this second easement is "ALSO INCLUDED," which clarifies that this second easement was not meant to limit how the Tidwells could use the first easement. Interpreting the deed as merely granting Rachael Tidwell an easement from the north end of her property would make part of the language of the deed superfluous, which would violate our duty to give effect "to every part of the instrument" such that "no part thereof" is

"discarded as superfluous or meaningless." *CNX Gas Co. LLC v. Rasnake*, 287 Va. 163, 168 (2014). *See also Foster v. Foster*, 153 Va. 636, 645 (1930).

In addition, the 60-foot easement existed well before the creation of the 15-foot easement as the 60-foot easement appears on the 1965 plat showing the land the Snyders deeded to Blanche Roberts. The Snyders had to use the 60-foot easement to access their own land once they conveyed most of their land fronting the public road to Blanche Roberts. It would defy common sense for the Snyders to grant their own daughter, Rachael Tidwell, a 60-foot easement that was somehow shorter than the 60-foot easement that they themselves used—especially given that the deed describes the 60-foot easement granted to Rachael Tidwell by reference to the 60-foot easement the Snyders reserved for themselves. Therefore, because the plain language of the deed refers to two separate easements and because the plat attached to the deed shows the 60-foot easement extends "over, along and across" the 15-foot easement, the circuit court did not err in its interpretation of the scope of the 60-foot easement (and, for example, in its interpretation that the 60-foot easement extended well past the 15-foot easement).

III. CONCLUSION

In short, the circuit court did not err in defining the dimensions of the Tidwells' easements or in ruling that neither the Tidwells nor the Goldsmiths can park in the easement, even on a temporary basis. The circuit court also did not err in ruling that the Goldsmiths' fence on the northern border of the 15-foot easement can remain in place. However, because the burden of proving adverse possession falls on the Tidwells who alleged such a claim (and thus had to show that their possession was hostile), the circuit court did indeed err in ruling that permission had to be pled by the Goldsmiths here as a defense to a claim of adverse possession. We do not reach the Goldsmiths' assignments of error concerning the statute of limitations for the adverse possession claim or the statute of limitations for the trespass claim (as those

assignments of error depend, in part, on the evidence that will be admitted and considered in further proceedings before the circuit court on remand addressing whether the Tidwells have had permission over the years to use part of the land under the Tidwells' carport that the survey shows is actually the Goldsmiths' land).  In addition, the circuit court did err in ruling that the Goldsmiths do not need to remove their trash hut from the easement, and we vacate that part of the circuit court's decision.  Consequently, for all of these reasons, we remand this case to the circuit court for further proceedings consistent with this opinion.

*Affirmed in part, reversed and vacated in part, and remanded, Record No. 0629-24-1.*
*Affirmed in part and reversed and remanded in part, Record No. 0666-24-1.*